IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT EMMERLING | : | CIVIL ACTION |
| | : | |
| v. | : | No. 14-5202 |
| | : | |
| STANDARD INSURANCE COMPANY | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                      **September 30, 2015**

Plaintiff Robert Emmerling brings suit against Standard Insurance Company (Standard), under Section 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), alleging Standard failed to pay short-term disability benefits to him from March 1, 2014, onwards, as due under his disability insurance policy.

Because Standard's decision to not award Emmerling benefits was supported by substantial evidence and was not arbitrary and capricious, the Court will grant summary judgment in favor of Standard and affirm Standard's decision to deny short-term disability benefits. Correspondingly, the Court will deny Emmerling's summary judgment motion.

## BACKGROUND

a. <u>Procedural History</u>

Emmerling, a data analyst, was insured through an employee welfare plan maintained by his former employee, Health Fitness Corporation (HFC), and funded by a group disability insurance policy issued by Standard. R. at 516.

On September 12, 2012, Emmerling stopped working due to his medical conditions. He returned to work full time on January 8, 2013. R. at 550. On October 26, 2012, Standard awarded Emmerling short-term disability benefits effective September 26, 2012. R. at 1082. On May 14,

2014, Standard approved Emmerling's application for long-term disability benefits for the period between December 11, 2012, and January 8, 2013. R. at 845.[1]

Emmerling stopped working once again on February 28, 2014. R. at 519. He filed a claim for short-term disability benefits effective March 1, 2014, on March 28, 2014. R. at 516. In support, Emmerling's primary care provider, Dr. Mark Simmons, M.D., completed an attending physician statement noting Emmerling suffered from chronic debilitating pain in his back, arms, and legs. R. at 442.

Emmerling's claim was denied by letter of May 16, 2014. R. at 457. He subsequently filed a counseled appeal. R. at 474, 487. Standard upheld the denial of benefits by letter of August 15, 2014. R. at 448. To date, Emmerling has not filed a claim for long-term disability benefits.

b. Medical History

Emmerling has long suffered from chronic pain and his medical history is replete with attempts to correctly diagnose and treat that pain's source.[2] Emmerling first underwent surgery on June 24, 2011, to treat a cervical disk herniation, which was causing pain in his left upper extremity. R. at 690. Although the surgery resolved that pain, he soon developed pain and paresthesias, a tingling or pricking sensation, affecting his upper right extremity. R. at 389. His

---

[1] Emmerling's claim for long-term disability benefits was initially denied on January 21, 2013, because Standard's records indicated he had returned to full-time work on December 4, 2013. R. at 838. After being informed Emmerling only returned to full-time work on January 8, 2013, Standard began the review process again. R. at 840, 866. On March 1, 2013, Standard again denied long-term disability benefits, determining Emmerling's condition was caused or contributed to by a pre-existing condition. R. at 842. After receiving new information regarding Emmerling's work history, however, Standard reversed its decision to apply the pre-existing condition exclusion and awarded Emmerling benefits. R. at 854.

[2] Although the key time period at issue for the claim under review is January 8, 2013, through March 1, 2014, the alleged onset of disability, the Court will also summarize the medical history underlying Emmerling's earlier period of disability to provide context.

neurologist, Dr. Eddie Garrido, recommended further surgery to decompress two nerve roots, R. at 390, which Emmerling underwent shortly thereafter, R. at 384. Dr. Garrido came to believe Emmerling's symptoms were caused by brachial plexus neuritis occurring after his surgery and further cervical spine surgery was unwarranted. R. at 348.

Emmerling, however, continued to complain of numbness and paresthesias on the right side of his face and into his right upper extremity throughout the autumn. R. at 360, 352. On October 3, 2011, Emmerling underwent the first of several transforaminal epidural steroid injections administered by Dr. Elliot B. Sterenfeld to treat his pain. R. at 366.

Attempting to find the underlying cause of his symptoms, Emmerling consulted with numerous doctors. On December 7, 2011, for instance, Emmerling saw Dr. Christopher Kager, M.D., a neurosurgeon, who could not find a structural or neurosurgical cause for Emmerling's symptoms, but instead referred him to a neurologist to rule out demyelinating disease. R. at 347. Further, on April 23, 2012, Emmerling was seen by his internist, Dr. Simmons. R. at 743. At that visit, Dr. Simmons noted Emmerling had been absent from routine care for over a year. R. at 743.

On June 5, 2012, Emmerling was examined by a neurologist, Dr. Matthew P. Wicklund. Dr. Wicklund believed Emmerling's symptoms suggested "left thalamic lesions" in the brain because "with the facial involvement . . . no other localization . . . could give these symptoms." R. at 315. He suggested conducting various scans and lab studies, as well as decreasing medications associated with cognitive dysfunction, as Emmerling had complained of occasional paraphastic language errors. R. at 313, 315. Emmerling underwent the recommended scans shortly thereafter. R. at 299. Both the MRI and MRA of the brain and neck were normal. R. at 300. The MRI of the spine indicated moderate foraminal stenosis, or narrowing, at several levels

and multilevel degenerative changes in the cervical and upper thoracic spine. R. at 300-01. The stenosis, however, was not to the point that it would impinge on nerve roots. R. at 297.[3]

Emmerling also underwent examination by pain specialists Dr. Yakov M. Vorabeychik, M.D., and Dr. Prabhakar Gundappu Reddy, M.D., who referred him for an EMG/nerve conduction study. Even though that study was normal, Emmerling continued to complain of "electric shock-like" constant pain accompanied by numbness. R. at 593. At a follow-up visit, Drs. Vorabeychik and Reddy noted they were "puzzled as to the nature of the patient's pain" and scheduled Emmerling for a "right third ganglion block," suspecting complex regional pain syndrome. R. at 589, 593. The procedure did not relieve any pain and numbness, however, R. at 589, 709, and Drs. Vorabeychik and Reddy noted their "diagnostic and treatment modalities" were exhausted. R. at 590. Because they did not have a clear etiology for Emmerling's symptoms, they requested his neurologist reevaluate or consult for a second opinion. R. at 590. Emmerling subsequently stopped working for the first time on September 12, 2012.

While on leave, Emmerling was examined by Dr. Tony Ton-That, a physiatrist, who noted Emmerling's neck pain worsened with neck movement and while lifting heavy weights. R. at 339. Dr. Ton-That recommended acupuncture, which Emmerling received several times, with no improvement. R. at 331, 333, 335, 337, 342. Emmerling also saw Dr. Simmons to adjust his medications because they were ineffective in controlling his pain, which included an increase in right-sided neck and shoulder pain and a new bilateral knee pain. R. at 702.

---

[3] Emmerling also underwent other scans and studies prior to his first period of disability. For instance, Emmerling underwent an EMG and nerve conduction study on September 27, 2011, which revealed "evidence of C6 and C7 radiculopathy on the right" but "no electrodiagnostic evidence of any other brachial plexopathy or generalized peripheral neuropathy in the right upper limb." R. at 373. A routine MRI on January 8, 2012, revealed "a broad-based disc bulge to the left of midline" at one vertebra and "a minimal disc bulge" at another, but the MRI revealed no significant canal or right foraminal stenosis at either location. R. at 343.

Emmerling returned to work after his first period of disability on January 9, 2013. Two days earlier, Dr. Wicklund reevaluated Emmerling. He noted Emmerling's knee pain was alleviated by Emmerling's discontinuance of his statin medication. R. at 286. However, Emmerling was also reporting a new symptom: pain in his left shoulder radiating down to his left hand. Emmerling told Dr. Wicklund acupuncture did not help, and he could not feel the needles on his right arm. R. at 286. Dr. Wicklund agreed that Emmerling should secure a third opinion from the Johns Hopkins Pain (JHU) Clinic. R. at 286. On January 19, 2013, Emmerling underwent a MRI of the cervical spine to investigate his new complaints of pain. R. at 329. The MRI revealed degenerative changes in the cervical spine most conspicuous at C3-C4 and C6-C7. R. 330. Still, it did not show nerve root impingement. R. at 330.

Emmerling was seen at the Blaustein Pain Treatment Center at JHU on January 22, 2013. R. at 117. The examining physician, Dr. Steven Paul Cohen, noted Emmerling was alert and oriented. He suggested Emmerling consider a spinal cord stimulator and a C4-C5, C6-C7 facet block, continue his current opioid regime, and add nortriptyline, an antidepressant. R. at 118-19. On January 29, 2013, Dr. Garrido again examined Emmerling after complaints of new left side pain. R. at 326. Dr. Garrido reviewed a new MRI, noted the C6-C7 disc was bulging more towards the left side with left neural foraminal compression and opined the bulge was "slightly worse." R. at 328. Dr. Garrido recommended an epidural, which Emmerling received from Dr. Sterenfeld on February 5, 2013. R. at 319. Dr. Sterenfeld noted Emmerling's pain "may represent C7 radicular pain," but his presentation was not typical. R. at 324. He observed Emmerling was awake, alert, oriented, fluent, and appropriate, with a normal attention span and concentration, and intact memory, language function, mental status, and cerebellar function. Emmerling later received a third epidural from Dr. Sterenfeld on June 6, 2013. R. at 319.

Emmerling called Dr. Simmons complaining of abdominal pain on February 26, 2013. R. at 216. This pain resolved in March after he discontinued a digestive aid he was taking. R. at 217. Dr. Simmons advised against additional narcotics use and advised Emmerling to follow up with JHU. R. at 217. At Emmerling's follow-up visit at JHU, he denied any pertinent changes of symptoms since his last visit. R. at 113. The physical exam revealed tenderness in the upper cervical spine down to the upper thoracic area and into the sternocleidomastoid area in the neck, but no tenderness on the left side. The musculoskeletal exam was normal, and Emmerling was alert and oriented to person, place, and time. R. at 114.

On April 23, 2013, Dr. Wicklund, the neurologist, performed a third evaluation. R. at 280. He noted Emmerling reported more pain in his right hand, shoulder, and elbow, but decreased numbness on his right face. R. at 280. He also noted Emmerling reported more episodes of "loopiness" unrelated to his medications, blurriness in right-side vision, an occasional inability to read, and bouts of perspiration. R. at 280. At the examination, however, Emmerling was oriented and displayed adequate knowledge, memory, attention span, language functions, and affective range. R. at 280. He did not display confusion or loopiness. R. at 281. Dr. Wicklund ordered an MRI of the brain, R. at 282, which showed no acute intracranial abnormalities, but a possible small vessel ischemic change. R. at 277-78.

At a May 3, 2013, appointment, Dr. Simmons discussed with Emmerling three violations of Emmerling's medication-use agreement in less than six months due to his self-adjustment of doses. R. at 209. Dr. Simmons told Emmerling he would no longer be able to prescribe controlled substances if Emmerling self-adjusted again. R. at 209. Meanwhile, a June 21, 2013, CT scan revealed multiple low-attenuation lesions throughout the liver and a four-millimeter noncalcified left lower lobe nodule abutting the major fissure in the lung. R. at 275-76.

Dr. Simmons referred Emmerling to a rheumatologist, Dr. Charles Henderson, on July 11, 2013. R. at 202, 435. Dr. Henderson noted Emmerling was alert and oriented, displayed normal reflexes, and demonstrated no cranial nerve deficit. R. at 437. He observed while Emmerling initially demonstrated strength deficiencies on flexion of his right hip, he generated good power in all muscle groups with encouragement. R. at 437. Nothing in Dr. Henderson's examination suggested an underlying inflammatory disease; thus, he suggested a three-phase bone scan to look for abnormalities consistent with reflex sympathetic dystrophy. R. at 439. Emmerling visited Dr. Henderson again several weeks later to complain of suddenly increased pain in his right thumb. R. at 425. Dr. Henderson treated the thumb with an injection. A follow-up visit several months later confirmed the injection was a success. R. at 418. Emmerling also complained of general hand stiffness, but Dr. Henderson found nothing suggesting arthritis, and both the lab work and x-rays were normal. R. at 428. Dr. Henderson noted, however, the cause of Emmerling's hand pain was unclear and tests were unremarkable. R. at 418. Dr. Henderson suggested the pain had a neuropathic cause and prescribed a trial NSAID. R. at 418.

On August 12, 2013, Dr. Simmons referred Emmerling to physical therapy and a psychologist, Dr. Robert B. Frazier, PhD, for pain management therapy. R. at 194-95. Dr. Frazier ended up seeing Emmerling for ten sessions between September 3, 2013, and December 20, 2013. R. at 122. Several months later, Dr. Simmons noted Emmerling was doing better on his medications and needed to continue physical therapy, which was helpful. R. at 186.

On January 14, 2014, Emmerling complained to Dr. Simmons of increased right arm and shoulder pain, as well as increased fatigue and head/neck diaphoresis, or perspiration. R. at 170. Dr. Simmons indicated the worsening pain and fatigue could be due to Emmerling's medications for cholesterol management and depression. R. at 171. On January 22, 2014, Emmerling was

evaluated by Rachel M. Ho, CRNP, for muscle aches and sudden onset dizziness. R. at 160. At this evaluation, Emmerling noted his pain was increasing slowly and consistently. R. at 161. But he was also alert and oriented to person, place, and time, and exhibited normal muscle tone and coordination. R. at 164. Nurse Practitioner Ho suggested the dizziness was precipitated by Emmerling's pain, rather than being cerebrovascular, and recommended monitoring. R. at 165.

On February 17, 2014, Emmerling complained to Dr. Simmons of increased pain after shoveling, using a snow blower, and hauling firewood, and reported "an episode of complete loss of energy." R. at 153. Dr. Simmons felt Emmerling had overexerted himself, but saw no symptoms or concerns requiring an urgent evaluation. R. at 154. A month later, Emmerling told Dr. Simmons he needed time off of work and saw a difference in his symptoms when taking time off. R. at 139. Emmerling also reported distinct episodes of severe, sudden fatigue and feelings of impending doom. R. at 140. Dr. Simmons recommended a nuclear stress test. R. at 140. On April 9, 2014, Emmerling reported increasing pain and resumed psychological treatment with Dr. Frazier. R. at 122, 132.

Dr. Simmons completed a functional capacities assessment form on July 2, 2014, after Standard's initial denial of short-term disability benefits. Dr. Simmons noted Emmerling was diagnosed with Chronic Pain Syndrome, degenerative joint disease, and anxiety, and was on numerous medications including Cymbelte (30 mg daily), Neurontin (300 mg), MS Contin (15 mg), and oxycodone (10 mg/6 hours) which resulted in fatigue and decreased cognition. R. at 100.

**LEGAL STANDARDS**

A motion for summary judgment will only be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). A factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted). In determining whether to grant summary judgment, the court "must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The court applies the same standard when deciding cross-motions for summary judgment. *See Selected Risks Ins. Co. v. Schwabenbauer*, 540 F. Supp. 22, 24 (E.D. Pa. 1982).

If an ERISA plan administrator is given discretion to determine eligibility for benefits or construe the terms of the plan, a district court reviews that determination for an abuse of discretion—that is, whether that decision was arbitrary and capricious. *See Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844-45, 845 n.2 (3d Cir. 2011) ("In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical.").

The plan at issue vests Standard with the "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve any questions arising in the administration, interpretation, and application of the Group Policy." R. at 66. This language "clearly triggers application of the deferential abuse of discretion standard of review." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (interpreting identical policy language).

Under this deferential standard of review, "[a]n administrator's decision constitutes an abuse of discretion only if it is without reason, unsupported by substantial evidence or erroneous

as a matter of law." *Miller*, 632 F.3d at 845 (internal citations and quotations marks omitted); *accord Howley v. Mellon Financial Corp.*, 625 F.3d 788, 792 (3d Cir. 2010). In conducting its review, a court must consider both "various procedural factors underlying the administrator's decision-making process, as well as structural concerns regarding how the particular ERISA plan was funded." *Miller*, 632 F.3d at 845.

The structural inquiry focuses on "the financial incentives created by the way the plan is organized, i.e., whether there is a conflict of interest." *Miller*, 632 F.3d at 845. Even when there is a conflict of interest, such as when a plan administrator both evaluates claims for benefits and pays them, the significance of that conflict is case-specific and merely one factor for a court's consideration. *See Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 117 (2008); *see also Howley*, 625 F.3d at 794 ("[An ERISA plan administrator]'s conflict of interest does not alter the standard of review for evaluating its decision to deny [plaintiff] benefits.").

The procedural inquiry examines "how the administrator treated the particular claimant." *Id.* This examination identifies "procedural anomalies . . . suggest[ive of] arbitrariness," such as (1) reversing a decision to award benefits without new medical evidence to support the change in position, (2) relying on the opinions of non-treating over treating physicians without reason, (3) conducting self-serving paper reviews of medical files, (4) failing to address all relevant diagnoses before terminating benefits, (5) relying on favorable parts while discarding unfavorable parts in a medical report, or (6) denying benefits based on inadequate information and lax investigatory procedures. *See Harper v. Aetna Life Ins. Co.*, No. 10-1459, 2011 WL 1196860, at *2 (E.D. Pa. Mar. 31, 2011) (citations omitted) (citing Third Circuit cases).

A court's review is generally limited to the record before the plan administrator when it made the decision under reviewed. *See Carney v. IBEW Local Union 98 Pension Fund*, 66 F.

App'x 381, 385 (3d Cir. 2003). However, the court may "consider evidence of potential biases and conflicts of interest . . . not found in the administrator's record." *Howley*, 625 F.3d at 794 (internal citations and quotation marks omitted) (permitting consideration of extrinsic evidence relating to the "nature, extent, and effect on the decision-making process of any conflict of interest" revealed during the litigation).

**DISCUSSION**

In order to qualify for short-term disability benefits for the period beginning March 1, 2014, Emmerling had the burden of proving to Standard he was "unable to perform with reasonable continuity the Material duties of [his] Own Occupation." R. at 20, 57. "Material duties" are "the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employees from those engaged in a particular occupation." *Id*. The Court must thus determine whether Standard's conclusion that Emmerling was able to perform a light-strength occupation and decision to deny short-term disability benefits to Emmerling was without substantial evidence, or arbitrary and capricious.

The Court finds Standard's decision to deny short-term disability benefits to Emmerling was not arbitrary and capricious because Standard relied on the well-supported opinions of its consulting physicians concerning Emmerling's ability to perform a light-strength occupation, and Emmerling failed to prove he could not perform that occupation. Furthermore, the Court finds no structural or procedural anomalies rendering Standard's decision arbitrary or capricious.

As for the structural factors, the Court recognizes Standard both funds and administers the award of disability benefits. Although the Court must weigh this conflict in its evaluation of the administrator's decision, it does not change the deferential abuse of discretion standard of review the Court applies. *See Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d

Cir. 2009). A conflict, moreover, "prove[s] less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Miller*, 632 F.3d at 847 (quoting *Glenn*, 554 U.S. at 117). For instance, the *Glenn* Court identified "walling off claims administrators from those interested in firm finances" or "imposing management checks that penalize inaccurate decisionmaking" as "active steps" that reduce potential bias. 554 U.S. at 117. Maintaining a separate unit to review the appeal of denied claims and identifying independent doctors to provide reviews also reduces bias. *See Neptune v. Sun Life Assur. Co. of Canada*, No. 19-2938, 2013 WL 5273785, at *8 (E.D. Pa. 2013).

Here, Standard referred Emmerling's claim and appeal to an independent analyst at each stage, who in turn referred the claim to a separate independent contractor physician. *See* R. at 73, 81, 106, 109. The two physician consultants assigned to Emmerling's claim, Dr. Mark Shih— who was assigned to the initial claim—and Dr. Jacob Hart—who was assigned to the appeal— were not compensated based on the outcome of the reviews, and Standard did not express to them any requirements or expectations regarding the ultimate conclusions or opinions to be provided. R. at 81, 109-10. Standard also maintains a separate Administrative Review Unit to provide an independent review of a decision to close a claim. R. at 481; *see also* R. at 65 (describing the review as conducted by "someone other than the person who denied the claim," who is neither "subordinate to that person" nor "give[s] deference to the initial denial decision").

Emmerling maintains Dr. Hart was not truly independent due to his longstanding relationship with Standard. A court may "consider evidence of potential biases and conflicts of interest that is not found in the administrator's record." *Howley*, 625 F.3d at 793. In support of his assertion that Dr. Hart was biased, Emmerling attached as an exhibit to his opposition brief a deposition from another case wherein Dr. Hart testified he had worked for Standard for over four

years and regularly spent one full day each week working from Standard's facility. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. A, at 8. Emmerling further asserts, based on Dr. Hart's prior deposition testimony, Dr. Hart improperly believes all the findings in a patient's history should match "and if they don't something is wrong." *Id.* at 8. Finally, Emmerling asserts Dr. Hart could not truly believe Emmerling did not suffer from cognitive impairments, as Dr. Hart previously testified opioid usage at a level lower than Emmerling's use could cause severe side effects. *Id.* at 8-9. Emmerling asks the Court treat Dr. Shih's assessment of Emmerling's disability with skepticism as well, because Dr. Shih's reports follow the same structure as Dr. Hart's and contain similar boilerplate language. *Id.* at 9. Again, such accusations of structural bias are one factor for the Court to consider when determining whether a plan administrator's decision to deny benefits was arbitrary or capricious. *See Glenn*, 554 U.S. at 112, 117. The Court will therefore consider Emmerling's allegations in light of any procedural concerns.

The Court finds no procedural anomalies tainting Standard's decision. Rather, the Court finds Standard relied on the well-supported opinions of its consulting physicians concerning Emmerling's ability to perform a light-strength occupation, and Emmerling failed to prove he could not perform such an occupation.

When denying Emmerling's claim, Standard indicated it had reviewed Emmerling's statements and descriptions of his symptoms, his medical records, a review conducted by a vocational consultant,[4] and a memorandum issued by physician consultant Dr. Mark Shih on

---

[4] The vocational expert determined Emmerling's occupation of data analyst was a light level occupation, requiring Emmerling to exert "up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly . . . to move objects." R. at 491.

May 8, 2014.[5] R. at 106, 457, 458. Only after considering the aforementioned records did Standard deny the claim, determining Emmerling's medical conditions did not prevent him from performing his occupation. R. at 460.

Standard's denial letter recognized Emmerling's history of chronic pain syndrome. R. at 406. However, Standard also noted Emmerling's condition appeared to be relatively stable over the past year, he had not presented sufficient evidence to support the degree of his claimed impairment, and his medical history and pain medical regimen failed to reflect an increase in his overall pain ratings during the relevant time period. R. at 460. Standard even noted Emmerling's self-reported physical activities—use of a snow blower, shoveling snow, and hauling firewood—require physical capacities well in excess of light-level exertion. R. at 108, 460.

Like the initial denial letter, Standard's August 15, 2015, letter upholding the denial of Emmerling's claim thoroughly explained the reason for denying benefits. Standard indicated Emmerling's file was reviewed by a consulting physician who was board-certified in physiatry and who was not previously consulted in conjunction with Emmerling's claim. Standard also explained it was crediting the analysis of that consulting physician, Dr. Hart, over that of treating physician Dr. Simmons in part because Emmerling's contemporaneous medical records were inconsistent with Dr. Simmons' functional capacity assessment. R. at 454. For instance, Standard noted the records provided by Dr. Simmons at the time Emmerling stopped working "were essentially the same as prior chart notes and supported no significant change to his condition or his medications," and "his medications had been relatively stable and only slight adjustments had been made . . . [which] would not be expected to produce any significant cognitive impairment."

---

[5] Dr. Shih previously reviewed Emmerling's medical records in conjunction with Emmerling's claim for long-term disability benefits for the earlier disability period on February 27, 2013. R. at 106.

R. at 454. Further, the neurologic examinations on the record were normal, and Dr. Simmons noted Emmerling was normal from a psychiatric and cognitive standpoint in January 2014, after which time his medications were not adjusted significantly. R. at 454. Moreover, no contemporaneous treatment notes indicate Emmerling was precluded from driving or other activities noted on the functional capacity assessment. R. at 454.

Emmerling relies primarily on three arguments to assert Standard acted in an arbitrary and capricious manner procedurally. First, Emmerling asserts Standard's reliance upon the opinions of non-treating physicians over his treating physician without providing a reason is arbitrary and capricious. Second, Emmerling asserts Standard's denial of Emmerling's short-term disability benefits claim on May 14, 2014, two days after awarding long-term disability benefits claim on May 14, 2014, without explaining its change in position also evinces bias. Finally, Emmerling argues Standard's acceptance of Dr. Simmons' diagnoses, but not the restrictions and limitations related to that diagnoses, is evidence of bias.

"Nothing in [ERISA] itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians[, n]or does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003); *see also Post v. Hartford Ins. Co.*, 501 F.3d 154, 166 (3d Cir. 2007) (noting while plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, ERISA "does not require that plan administrators give the opinions of treating physicians special weight").

In fact, it is within a plan administrator's "discretion to weigh the medical evidence." *Morningred v. Delta Family-Care & Survivorship Plan*, 526 F. App'x 217, 221 (3d Cir. 2013). Despite the absence of a burden of explanation, the record indicates Standard thoroughly

considered the records provided by Dr. Simmons and Emmerling's other treating physicians and explained why it disavowed Dr. Simmons' functional capacity assessment form. In evaluating Emmerling's initial claim for benefits, Dr. Shih noted Emmerling's condition had actually improved since his previous period of disability, as "previously identified focal motor deficits [were] no longer present" and the records contained no "further mention of focal neurological deficits since that time." R. at 108. Dr. Shih also noted Emmerling's left shoulder and thumb pain improved after injections, R. at 108, and the record did not indicate "a reflected increase in his overall pain ratings, nor increase in his overall pain medication regime to reflect a significant change." R. at 109. Dr. Shih opined Emmerling's pain medication would not impose cognitive or functional limitations, as his overall medication regimen had not undergone a significant change in the time between his previous period of disability and the present period. R. at 109.

In reviewing the denial of benefits, Dr. Hart expressly noted Dr. Simmons' findings regarding Emmerling's limitations were not consistent with neurological and physical examinations performed by his various treating physicians. R. at 79, 80. Dr. Hart noted Emmerling's medications were relatively stable and any slight adjustment of Emmerling's medications would not produce any significant cognitive impairments. Dr. Hart further noted Dr. Simmons' "medical records . . . do not indicate that he has precluded [Emmerling] from driving or the activities noted in his Functional Capacity Assessment," and Dr. Simmons's January 2014 notes indicated Emmerling had normal cognition. R. at 80. Finally, Dr. Hart observed Dr. Simmons' assessment was inconsistent, as Dr. Simmons indicated Emmerling had physical limitations and restrictions despite failing to perform a physical examination. R. at 80.

Standard also directly addressed the concerns Emmerling raised on appeal in its letter upholding the denial. For one, Emmerling asserted that contrary to Standard's findings, his

medication had been adjusted, as he was placed on MS Contin in May 2012 and has taken it every day since. R. at 455, 474. Standard acknowledged Emmerling's medications changed in May 2012, but also noted Emmerling's medication regimen had been relatively stable since that time and there was no evidence the regimen changed during the time he ceased working in 2014. Additionally, Standard responded to Emmerling's contention that his condition worsened after February 17, 2014, while blowing and shoveling snow, and that Standard minimized his back condition, by explaining Emmerling's contemporaneous medical records nonetheless did not support the severity of limitations advocated by Dr. Simmons as his condition was essentially stable without more than minor variations in pain ratings or medications. R. at 455. When an evaluating physician is able to point to reliable evidence conflicting with a treating physician's evaluation, as it has here, the Court is "constrained to conclude that there was substantial evidence supporting the denial." *Steele v. Boeing Co.*, 225 F. App'x 71, 75 (3d Cir. 2007).

Similarly without merit is Emmerling's assertion that Standard's denial of the claim at issue followed by its award of long-term disability benefits claim on May 14, 2014, was arbitrary and capricious. Emmerling argues nothing in his condition changed over two days and Standard made no attempt to explain what changed in Emmerling's condition. Pl.'s Br. in Support of Pl.'s Mot. for Summ. J. 11. But as Emmerling himself acknowledges, these two decisions cover claims arising from different time periods.[6] Thus, they require separate proofs of disability. The long-term disability benefits awarded to Emmerling on May 14, 2014, were for a period of disability between December 11, 2012, and January 8, 2013. R. at 845-46. In contrast, the instant claim concerns a period of disability beginning on March 1, 2014. R. 516-17. That Emmerling's

---

[6] The parties, furthermore, agree Emmerling was awarded benefits for this earlier period of disability on May 14, 2014, because new information came to light regarding Emmerling's work history, which affected his eligibility for disability benefits. *See supra* n.1.

conditions satisfied the policy's definition of disability between December 11, 2012, and January 8, 2013, does not mean his conditions satisfied the policy definition as of March 1, 2014.

The Court also finds final Emmerling's assertion Standard selectively credited Dr. Simmons' findings in order to accept his diagnoses, but not his prognoses, without providing a reason, without merit. "A professional disagreement does not amount to an arbitrary refusal to credit." *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 258 (3d Cir. 2004). Further, as set forth above, Standard explained it did not credit the restrictions and limitations articulated by Dr. Simmons because his treatment records were inconsistent with his opinions. As it is up to the plan administrator's "discretion to weigh the medical evidence," *Morningred*, 526 F. App'x at 221, so long as the administrator's decision is supported by substantial evidence, the Court may not substitute its own judgment. *See also Eppley v. Provident Life & Acc. Ins. Co.*, 789 F. Supp. 2d 546, 572 (E.D. Pa. 2011) ("[W]here claims as to the existence or degree of subjective pain are unsubstantiated, the plan administrator has the discretion to disregard them.").

In light of the substantial evidence supporting Standard's decision to deny Emmerling's claim and uphold that denial, the Court finds Standard's decision was not arbitrary or capricious. Standard's denial was not tainted by procedural conflicts. Moreover, Standard took steps to minimize any structural conflict and the Court does not find Drs. Hart and Shih's alleged conflicts of interest tainted Standard's decision. The Court will therefore affirm the plan administrator's denial of benefits.

An appropriate order follows.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, J.